IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| GABRIELLE ROGERS, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED; | § § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | CIVIL ACTION NO.  1:19-CV-00266 |
| 12291 CBW, LLC, RCI DINING SERVICES (BEAUMONT), INC. D/B/A TEMPTATIONS CABARET, RCI HOSPITALITY HOLDINGS, INC., JAI DINING SERVICES (BEAUMONT), INC., | § § § § § § § | JUDGE MICHAEL TRUNCALE |
| *Defendants*. | § § | |

## <u>ORDER ON PLAINTIFFS' MOTIONS FOR CERTIFICATION AND FOR APPROVAL OF NOTICE AND CONSENT FORM</u>

Before the Court are Plaintiffs' Motion for Certification Under the Fair Labor Standards Act, [Dkt. 108], and Motion for Approval of Notice and Consent Form. [Dkt. 110]. After considering the Motions, pleadings, oral arguments made during the hearing, and all applicable law, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Certification Under the Fair Labor Standards Act. [Dkt. 108]. It **DISMISSES** Ashley Wilburn's claims **WITHOUT PREJUDICE**. Due to issues raised in the pleadings, the Court **ORDERS** additional briefing on whether RCI Hospitality Holdings, Inc. and RCI Dining Services (Beaumont), Inc. are proper Defendants in this action. Accordingly, this Court **DENIES** Plaintiffs' Motion for Approval of Notice and Consent Form. [Dkt. 110].

### I.    BACKGROUND

Plaintiffs, former exotic dancers, bring suit under the Fair Labor Standards Act (the "FLSA") because they believe that they were misclassified as independent contractors instead of

as employees. [Dkt. 108 at 8]. Defendants operate the clubs for whom Plaintiffs formerly danced in Beaumont and Fort Worth. *Id.* at 7. Plaintiffs contend that a collective action is the best vehicle to resolve the claims of a collective they believe could marshal 800 members. *Id.*

This is Parties' second round of briefings regarding class certification. Plaintiffs first moved for certification in 2020, [Dkt. 32], but this Circuit's decision in *Swales v. KLLM Transport Servs., LLC*, 985 F.3d 430 (5th Cir. 2021) in January of 2021 necessitated new briefing. On March 15, 2021, this Court entered a Pre-Notice Scheduling Order allowing Plaintiffs to complete limited discovery. [Dkt. 76]. On December 14, 2021, the Court heard arguments on Plaintiffs' Motions for Certification, [Dkt. 108], and Approval of Notice and Consent Form, [Dkt. 110]. Now it has reached a decision.

## II.    LEGAL STANDARD

The FLSA requires covered employers to pay each employee a minimum wage and overtime. § 207(a). Section 216(b) of the FLSA allows an employee to sue her employer for violating the FLSA's hour and wage provisions on "behalf of himself . . . and other employees similarly situated." § 216(b). In contrast to a class action brought under Federal Rule of Civil Procedure 23, Section 216(b) utilizes an "opt-in" scheme: the putative class members must affirmatively notify the court of their intention to join the class. *In re JPMorgan Chase & Co.*, 916 F.3d 494, 500 (5th Cir. 2019); *compare* § 216(b), *with* FED. R. CIV. P. 23.

This Circuit recently rejected the approach set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987) and issued new guidance for determining whether putative class members are "similarly situated" in *Swales*, 985 F.3d 430. Under *Swales*, "the district court has broad, litigation-management discretion [regarding class certification]." *Id.* at 443. In fact, there are only two "binding commands on district courts" when it comes to class certification:

> (1) the FLSA's text, specifically § 216(b), which declares (but does not define) that only those 'similarly situated' may proceed as a collective; and (2) the Supreme Court's admonition that while a district court may 'facilitat[e] notice to potential plaintiffs' for case-management purposes, it cannot signal approval of the merits or otherwise stir up litigation.

*Id.* at 434. The aim is to "identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'" *Id.* at 439. Only then can a court determine whether to grant certification and issue opt-in notice. *Id.* at 434.

District courts "have discretion" to facilitate notice of a collective action to potential plaintiffs. *Id.* (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)). However, "courts may not send notice to an employee with a valid arbitration agreement unless the record shows that nothing in the agreement would prohibit that employee from participating in the collective action." *Id.* at 501.

### III.   DISCUSSION: CLASS CERTIFICATION [DKT. 108]

Defendants argue that class certification is barred by the Entertainer License Agreements (the "ELAs") that the named Plaintiffs signed. Each ELA contains an arbitration provision with an embedded class and collective action waiver. Therefore, the Court must first examine whether Plaintiffs are contractually barred from collectivizing. Second, the Court addresses the issue of Ashley Wilburn and the Fort Worth dancers. Third, the Court analyzes whether Plaintiffs are similarly situated.

#### A. The Arbitration Provision and the Class Action Waiver.

As a threshold matter, the Court must determine if Plaintiffs *can* collectivize. Every dancer had to sign an ELA before she was allowed to perform at either club, and every ELA during the relevant period contained a class and collective action waiver within an arbitration provision. To determine whether certification is possible, the Court begins with an overview of the ELAs. Next,

it considers whether the arbitration provision is enforceable. Finally, it determines whether the class and collective action waivers are enforceable, not only as to the named Plaintiffs but also to putative class members. It concludes that Plaintiffs are barred from asserting a collective action—or, in the case of the putative members, joining a collective action—against JAI Dining Services (Beaumont), Inc. ("JAI") or 12291 CBW, LLC ("CBW") *only*.

### 1.   An Overview of the Entertainer License Agreements.

The Court begins with a survey of the ELAs. The ELAs are between each individual dancer and either JAI or CBW. JAI signed the ELAs for the Beaumont dancers, [*E.g.*, Dkt. 118-2 at 1; Dkt. 118-3 at 1], CBW for those in Fort Worth. [*E.g.*, Dkt. 53-3].[1] Each ELA contains an arbitration provision (the "Arbitration Provision"). While the Arbitration Provision spans three pages, one part is reproduced below with its original emphasis:

**ARBITRATION**

**The parties agree that, pursuant to the Federal Arbitration Act (the "FAA"), any and all disputes between Licensee and Licensor, or any of its parents, subsidiaries, employees or affiliates, including, but not limited to, disputes in connection with the performance of services by Licensee at the Club or in connection with any future relationship of any kind between Licensee and the Club, will be subject to binding arbitration….**

[Dkt. 53-3 at 6; Dkt. 118-2 at 6; Dkt. 118-3 at 6].

Within the Arbitration Provision rests what the Court refers to as the "Class Waiver":

**THE PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BY SIGNING THIS AGREEMENT THEY SPECIFICALLY WAIVE ANY RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR COLLECTIVE ACTION AS AGAINST THE OTHER PARTY AND IF AT ANY TIME LICENSEE IS DEEMED A MEMBER OF ANY CLASS CREATED BY ANY COURT, ARBITRATOR OR ANY OTHER TRIBUNAL, SHE WILL "OPT OUT" OF SUCH CLASS AT THE FIRST OPPORTUNITY, AND SHOULD ANY THIRD PARTY PURSUE ANY CLAIMS ON HER BEHALF**

---

[1] Defendants explicitly incorporate this previous briefing.

4

**LICENSEE SHALL WAIVE HER RIGHTS TO ANY MONETARY RECOVERY.**

[Dkt. 53-3 at 8; Dkt. 118-2 at 8; Dkt. 118-3 at 8 (emphasis original)].

These excerpts demonstrate that, while the Arbitration Provision begins by stating that it covers "**any and all disputes between Licensee and Licensor, or any of its parents, subsidiaries, employees or affiliates**," [Dkt. 53-3 at 6; Dkt. 118-2 at 6; Dkt. 118-3 at 6], the Class Waiver does not use this expansive language. It refers only to "**THE PARTIES**"—the licensor (JAI or CBW) and the licensee (the dancer)—and specifies that the Class Waiver refers to the right to participate in actions against "**THE OTHER PARTY**." [Dkt. 53-3 at 8; Dkt. 118-2 at 8; Dkt. 118-3 at 8 (emphasis original)]. Therefore, the Class Waiver, even at full force, is only effective against the other signatory, the party opposite the dancer.[2] Here, the other party is JAI or CBW.

Here, the Court must recount the curious case of JAI. Plaintiffs assert that there are only three defendants in this case: (1) 12291 CBW, LLC ("CBW"); (2) RCI Dining Services (Beaumont), Inc. ("RCI Dining"); and (3) RCI Hospitality Holdings, Inc ("RCI Holdings"). Accordingly, Plaintiffs contend that Defendants are not at liberty to enforce the Arbitration Provision because Defendants did not sign the ELAs. According to Plaintiffs, JAI is not associated with any of the Defendants. [Dkt. 39-1]. Defendants do not contest this and instead argue that they can enforce the Arbitration Provision as non-signatories.

JAI *is* a Defendant. It was added in the live Complaint, Plaintiffs' Third Amended Complaint [Dkt. 75], it appeared, and it filed an Answer. [Dkt. 80]. In their Third Amended Complaint, Plaintiffs allege that JAI "is a Texas for-profit corporation that does business in Harris

---

[2] This is the case even if this language is deemed ambiguous. A contract is ambiguous if it "is subject to two or more reasonable interpretations." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). When there is "reasonable doubt as to" a contract's interpretation, it may be construed against the drafter under Texas law. *Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1043 (5th Cir. 1991). The drafter is JAI or CBW, so the narrower interpretation of "Parties"—*just* the dancer and either CBW or JAI—would prevail.

County, Texas." [Dkt. 75 at ¶ 12]. Plaintiffs also aver that "[f]or all intents and purposes, Defendants 12291 CBW, LLC; RCI Dining Services (Beaumont), Inc.; Defendant JAI Dining Services (Beaumont), Inc.; and RCI Hospitality Holdings, Inc. are effectively the same company and operate as a single enterprise. . . . The Defendants share the same officers and directors, such as Eric Langan" who "oversees and controls" their operations. [Dkt. 75 at ¶ 16]. But JAI was not included in the captions of the Third Amended Complaint or Answer, even though it was listed as a Defendant in the body of both pleadings. [Dkts. 75, 80]. The Court has found no motion to dismiss JAI or to restyle the case. Parties overlooked JAI's status as a defendant in this action. This was likely facilitated by the number of defendants in this case who have come and gone with each amended complaint, JAI's being left off of the case captions by both sides, and the fact that all Parties borrow from their first series of pre-*Swales* briefs, which were drafted before JAI was added as a Defendant. But, while JAI may be out of sight and out of mind, it is still a defendant. And, as a Defendant–signatory, JAI may enforce the Arbitration Provision as one of "**THE PARTIES**."

A separate provision of the ELA, "Miscellaneous," contains two relevant clauses: the "Severability Clause"[3] and the "No-Waiver Clause." The Severability Clause states that:

> If any provision of this Agreement or the application thereof to any person or circumstance shall, for any reason and to the extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to the other person or circumstance shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

---

[3] Plaintiffs contend that the ELAs also contain an express prohibition against severance: "THE ARBITRATOR SHALL NOT HAVE THE POWER TO ALTER OR MODIFY ANY EXPRESS PROVISION OF THIS AGREEMENT, OR TO RENDER AN AWARD WHICH, BY ITS TERMS, HAS THE RESULT OF EFFECTING SUCH ALTERATION OR MODIFICATION." [*E.g.*, Dkt. 118-3 at 7]. This is not a severability clause, especially in light of the ELA's express Severability Clause. Plaintiffs' interpretation would also conflict with another clause within the Arbitration Provision: "THE ARBITRATOR SHALL HAVE THE AUTHORITY TO MODIFY SUCH PROVISIONS TO ALLEVIATE ANY INVALIDITY, UNENFORCEABILITY AND/OR UNCONSCIONABILITY." *Id.* This language evinces an intent to allow for invalid, unenforceable, and unconscionable clauses to be excised.

[Dkt. 53-3 at 8; Dkt. 118-2 at 8; Dkt. 118-3 at 8]. Finally, the "No-Waiver Clause" provides that JAI or CBW's:

> [F]ailure to insist on compliance or enforcement of any provision of this Agreement shall not affect the validity or enforceability of this Agreement or operate or be construed as a waiver of any future enforcement of that provision or any other provision of this Agreement.

*Id.*

### 2.   The Enforceability of the Arbitration Provision.

Defendants are not attempting to compel Plaintiffs into the arbitral. However, because the Class Waiver is embedded within the Arbitration Provision, this Court must determine whether an enforceable arbitration agreement exists. *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398 (5th Cir. 2022). This includes determining the Arbitration Provision's enforceability between the Parties. *Id.* ("[D]eciding enforceability between the parties and an arbitration agreement's existence are two sides of the same coin."). This Circuit uses a two-step inquiry to determine if the parties agreed to arbitrate a claim. "The first is contract formation—whether the parties entered into *any arbitration agreement at all*. The second involves contract interpretation to determine whether *this* claim is covered by the arbitration agreement." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis original). The ELAs delegate the issue of arbitrability to the arbitrator, so this Court will only assess whether there is a valid arbitration agreement. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

The Federal Arbitration Act (the "FAA") provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Therefore, "[i]n determining the validity of an agreement to arbitrate under the FAA, courts must first apply state law governing contract formation." *In re Poly-Am., L.P.*, 262 S.W.3d 337, 347 (Tex. 2008). Under Texas law, arbitration agreements "are valid unless

grounds exist at law or equity for the revocation of the agreement." *Id.* at 348. "The burden of proving such a ground—such as fraud, unconscionability or voidness under public policy—falls on the party opposing the contract." *Id.* This burden falls on Plaintiffs, who argue that the provision is unenforceable due to unconscionability and waiver.[4]   The Court takes each in turn.

### i.  Unconscionability.

If the Class Waiver is void due to unconscionability, then it is void not only as to the named plaintiffs but also as to the absent class members. Plaintiffs aver that the arbitration provision is unconscionable because it deprives dancers of their rights under the FLSA by allegedly shortening the statute of limitations and waiving their rights to attorneys' fees and liquidated damages. [Dkt. 39 at 19–20; Dkt. 121 at 36–37].[5] First, the Court surveys the law. Second, the Court applies that law to this case. Third, the Court finds that any unconscionable clauses can be severed.

### a.  Applicable Law: Unconscionability in Texas.

Texas public policy "strongly" favors freedom to contract. *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005). But this freedom is not absolute, and unconscionable contracts are unenforceable. *In re Poly-Am.*, 262 S.W.3d at 348. When determining if an arbitration agreement is enforceable, courts consider only "issues relating to the making and performance of the agreement to arbitrate." *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967); *see also Coronado v. D.N. W. Hous., Inc.*, No. H-13-2179, 2015 WL 5781375, at *7 (S.D. Tex. Sept. 30, 2015) ("The court may evaluate the unconscionability of an arbitration clause but not the unconscionability of the contract as a whole.") (citing *Banc One Acceptance*

---

[4] Plaintiffs also argued that the Arbitration Provision is invalid due to a lack of consideration. The Court dispenses with this here: "Bilateral promises are valid considerations for arbitration clauses." *Coronado v. D.N.W. Hous., Inc.*, No. H-13-2179, 2015 WL 5781375, at *5 (S.D. Tex. Sept. 30, 2015) (citing *Sharpe v. AmeriPlan Corp.*,769 F.3d 909, 918 (5th Cir. 2014)).
[5] Plaintiffs incorporated Dkt. 39 by reference.

*Corp. v. Hill*, 367 F.3d 426, 430 (5th Cir. 2004)). The party seeking to invalidate the provision bears the burden of proof. *In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002).[6]

Arbitration agreements covering statutory claims can be valid if they do "not waive the substantive rights and remedies the statute affords and the arbitration procedures are fair, such that the employee may 'effectively vindicate his statutory rights.'" *In re Poly-Am*, 262 S.W.3d at 349 (quoting *In re Halliburton*, 80 S.W.3d at 572).[7] A party must not be "forced to 'forgo the substantive rights afforded by the statute,' as opposed to merely 'submit[ting] to resolution in an arbitral, rather than a judicial, forum.' *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler– Plymouth, Inc.*, 473 U.S. 614, 628 (1985)) (alterations original)). Thus, the crux of the Court's inquiry "is whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, a forum where the litigant can effectively vindicate his or her rights." *In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 894 (Tex. 2010).

## b.  Application.

Plaintiffs have directed the Court to a few problematic clauses within the Arbitration Provision. To start, the FLSA allows prevailing plaintiffs to collect liquidated damages. 29 U.S.C.A. § 216(b). In contrast, the ELAs preclude liquidated damages: "THE ARBITRATOR SHALL HAVE NO AUTHORITY TO AWARD PUNITIVE, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES." [Dkt. 53-3 at 7; Dkt. 118-2 at 7; Dkt. 118-3 at 7]. Thus, the ELA interferes with at least one substantive right that the dancers enjoy under the FLSA.

---

[6] There are two types of unconscionability: (1) procedural, which examines the circumstances surrounding the adoption of the provision; and (2) substantive, which examines the fairness of the provision. *In re Halliburton*, 80 S.W.3d at 571. Plaintiffs focus on substantive unconscionability, so the Court will too.

[7] As a threshold matter, arbitration provisions are compatible with the FLSA. *See Epic Sys. Corp. v. Lewis et al.*, 138 S. Ct. 1612, 1626 (2018) (holding that a collective action scheme borrowed from the FLSA "does not displace the Arbitration Act or prohibit individualized arbitration proceedings") (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991)). The same goes for class action waivers, which "are upheld because they are contractual provisions that do not affect any substantive rights." *Convergys Corp. v. Nat'l Labor Relations Bd.*, 866 F.3d 635, 639 (5th Cir. 2017).

Plaintiffs also argue that the ELAs deprive dancers of attorneys' fees, which the FLSA allows victorious plaintiffs to recover. § 216(b). Other courts have held provisions regarding attorneys' fees to be unenforceable. *E.g.*, *Coronado*, 2015 WL 5781375, at *10 ("Because the [contracts] have provisions allowing the defendant clubs to recoup attorneys' fees from the plaintiffs even if they prevail on their FLSA claims, the arbitration clauses are unenforceable unless those provisions are severable."). This case is distinguishable because the ELAs allow arbiters "TO THE EXTENT PERMITTED BY APPLICABLE LAW, AWARD COSTS INCURRED FOR THE PROCEEDINGS AND REASONABLE ATTORNEYS' FEES TO THE PREVAILING PARTY." [Dkt. 53-3 at 7–8; Dkt. 118-2 at 7–8; Dkt. 118-3 at 7–8]. Thus, this language does not conflict with the FLSA because it allows the arbiter, *within the bounds of the law*, to award attorneys' fees to prevailing parties. It does not necessarily deprive victorious dancers of their statutory rights.

Similarly, Plaintiffs allege that the ELAs unconscionably truncate the statute of limitations to only one year. The FLSA provides a two-year statute of limitations. § 255(a). If the ELAs *were* to halve the statute of limitations, the Court would find this to intrude on Plaintiffs statutorily conferred rights under the FLSA. However, while the ELAs provide that arbitration must be brought within one year of a claim's accrual, this statement is cabined by a familiar phrase preceding it: "TO THE EXTENT PERMITTED BY APPLICABLE LAW." [Dkt. 53-3 at 8; Dkt. 118-2 at 8; Dkt. 118-3 at 8]. But the Court need not tread further down the path of deciphering whether these provisions are unconscionable—even if all these provisions are unconscionable and unenforceable, they are, as the Court explains in the following section, also all severable.

### c.  Adding the Severability Clause to the Equation.

"An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement." *In re Poly-Am.*, 262 S.W.3d at 360 (citation omitted). "Whether or not the invalidity of a particular provision affects the rest of the contract depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract." *Id.* (citation omitted). To make this determination, courts ask whether the parties would have struck the agreement absent the unenforceable provision. *Id.*

"[W]hen the severed portion is integral to the entire contract, a severability clause, standing alone, cannot save the contract." *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 87 (Tex. App.—Houston [14th Dist.] 1996, writ denied). But while severability clauses may not be silver bullets, their existence evinces an intent to excise unenforceable provisions when possible; therefore, many courts have severed unconscionable provisions when a severability clause is present. *See, e.g.*, *In re Poly-Am.*, 262 S.W.3d at 359–61 (severing unconscionable provisions and enforcing the arbitration clause, in part, because the inclusion of a severability clause expressed the parties' intent "that unconscionable provisions be excised where possible").[8] Put simply, their mere presence "sheds light on the agreement's 'essential purpose.'" *Coronado*, 2015 WL 5781375, at *10 (citing *John R. Ray & Sons*, 923 S.W.2d at 87). One case, *Coronado v. D.N.W. Houston, Inc.*, is especially instructive because it analyzed two distinct agreements—one with a severability clause, the other without. *Id.* at *11. After finding that both contained unconscionable clauses, the court severed the unenforceable language from the agreement with a severability clause but refused to do the same for the agreement that lacked a severability clause. *Id.*

---

[8] Cases in which courts have refused to sever unconscionable provisions are distinguishable. *See, e.g.*, *Andrio v. Kennedy Rig Servs., LLC*, No. 4:17-cv-1194, 2017 WL 6034125, at * (S.D. Tex. Dec. 6, 2017) (refusing to sever an unconscionable provision because the provision itself stated that it would "survive termination" and was the *only* section of the contract that was capitalized and bolded—neither of these factors exists here).

This Arbitration Provision spans three pages of the ELA and contains many unchallenged clauses detailing, for example: the selection of the impartial independent; procedures for emergency hearings; a statement that the provision is "self-executing and shall remain in full force after expiration or termination of this Agreement"; and the place of arbitration. [Dkt. 53-3 at 6–8; Dkt. 118-2 at 6–8; Dkt. 118-3 at 6–8]; *see also In re Poly-Am.*, 262 S.W.3d at 360 (severing unconscionable clauses when the arbitration agreement was "over five pages long and contain[ed] numerous provisions not challenged by [plaintiff] as imposing any unconscionable burdens: procedures for mediation, selection of a neutral arbitrator, filing of motions, and other general provisions governing arbitration procedures.").

Here, the intent of the Parties, demonstrated by their inclusion of the Severability Clause,[9] is that unconscionable language should be excised when possible. Severing any of the clauses Plaintiffs argue are unconscionable will not undermine the main purpose of the Arbitration Provision: that Parties submit covered disputes to an arbitral. *See, e.g., In re Poly-Am.*, 262 S.W.3d at 360 (determining that a contract's remedies-limitation provisions were unconscionable but finding "no reason why they cannot be easily excised from the contract without defeating its underlying purpose."). Therefore, to the extent that these clauses are unconscionable, they may be severed, leaving the Arbitration Provision and its embedded Class Waiver enforceable.

### ii.  Waiver of the Arbitration Provision.

The Arbitration Provision and its nested Class Waiver are theoretically enforceable. Now the Court must question whether Defendants have waived the ELAs' Arbitration Provision and, if so, whether the Class Waiver was similarly waived, not only as to the named Plaintiffs but also as

---

[9] Plaintiffs argue that excising unconscionable provisions is tantamount to "rewriting the contract based on guessing at the parties' intent," something that courts avoid. *See Coronado*, 2015 WL 5781375, at *11 (collecting cases in which courts refused to sever unconscionable provisions in lieu of a severance clause). As explained, the Severability Clause informs the Court of Parties' intent.

to any putative class members. Defendants aver that they have not waived the Class Waiver because they "have vigorously contested Plaintiffs' right to seek" certification. [Dkt. 118 at 10]. Plaintiffs counter that Defendants waived their right to enforce the Class Waiver when they waived the Arbitration Provision because the Class Waiver is an "essential purpose" of the Arbitration Provision and, therefore, cannot be severed.

The Court need not painstakingly address whether Defendants have waived the Arbitration Provision. This is because: (1) Defendants do not seek to compel arbitration; (2) even if the Arbitration Provision were waived, the Class Waiver survives; and (3) even if *both* the Arbitration Provision and Class Waiver were waived, these provisions were only waived as to the named Plaintiffs—not to the putative class members.[10] For brevity's sake, the Court proceeds straight to whether, assuming that Defendants waived the Arbitration Provision, they necessarily waived the Class Waiver as to the named Plaintiffs and as to the absent collective. It finds that they have not.

### 3. Enforceability of the Class Waiver.

"Waiver of some rights does not mean that the party relinquishes its rights to have the contract fully performed as to the remaining provisions." *Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.*, 907 S.W.2d 904, 911 (Tex. App.—Houston [1st Dist.] 1995, writ denied). The ELA explicitly incorporates this principle into its four corners through its No-Waiver Clause. The question here is whether, if the Defendants waived the Arbitration Provision, they would have also waived the Class Waiver within it. The Fifth Circuit recently grappled with this puzzle in *Vine v. PLS Fin. Servs., Inc.*, 807 Fed. App'x 320 (5th Cir. 2020). It opined that:

> [T]he most plausible way to interpret a class action waiver in the middle of an arbitration provision is as part of the explanation of the rules, rights, and procedures that apply if a dispute is arbitrated—*not* as an independently effective waiver of the

---

[10] In short: neither the Class Waiver nor the Arbitration Provision have been waived as to the putative plaintiffs, which thwarts certifying a collective action against JAI or CBW. This is irrespective of the analysis as to the named Plaintiffs.

right to pursue a class action outside the arbitration context. The [signatories] gave up their right to participate in a class action *by virtue of* their agreement to resolve disputes exclusively through individual arbitration. But once [drafters] waived the arbitration provision, the [signatories] were free to select another form of dispute resolution, including a class action.

*Id.* at 328 (internal citations and quotations omitted) (emphasis original).[11] This cuts against Defendants' argument that the Class Waiver transcends the Arbitration Provision, even though it appears under the "Arbitration" and not the "Legal Action" section of the ELA.[12]  *Vine*'s strong language also appears to support Plaintiffs' argument that the Class Waiver "forms a necessary part of the arbitration provision." [Dkt. 121 at 33]. But *Vine*, like all precedent, is a compass—not a GPS. While *Vine* necessarily guides the Court's analysis in one direction, the Court must still apply *Vine*'s reasoning to the contours of this case to reach the correct destination. Defendants contend that *Vine* is not a good fit because it concerns the Deceptive Trade Practices Act and a class, as opposed to a collective, action. While true, these distinctions are inapposite. To start, this Class Waiver also waives class actions in addition to collective actions. And, while this is an FLSA action, the heart of *Vine*'s reasoning is in contract interpretation, and not a particular cause of action.

However, other differences are material. These ELAs contain both severability and a no-waiver clauses, neither of which *Vine* addresses. *See Figuredo-Chavez v. RCI Hospitality Holdings, Inc., et al.*, No. 1:21-cv-21733, 2021 WL 5763577, at *5 n.1 (S.D. Fla. Dec. 3, 2021)

---

[11] At least one court in another Circuit has declined to follow *Vine*, but this Court must follow the Fifth Circuit. *See Figuredo-Chavez v. RCI Hospitality Holdings, Inc., et al.*, No. 1:21-cv-21733, 2021 WL 5763577, at *5 (S.D. Fla. Dec. 3, 2021) (distinguishing and declining to follow *Vine*).

[12] The "Legal Action" provision is above the Arbitration Provision. It is separately numbered and brief:

> THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

[Dkt. 118-1 at 5; Dkt. 118-3 at 5]. It does not touch on collective actions.

("In *Vine*, the Fifth Circuit did not address issue of whether a collective action waiver can be severed from an agreement to arbitrate."). These differences make all the difference. The inclusion of these clauses sheds light on the intent of the parties and the purpose of the agreement. The Court finds that, even if the Arbitration Provision were waived as to the named Plaintiffs, the Class Waiver would remain as to the named Plaintiffs.

### i.      The Absent Collective.

The Defendants have waived neither the Arbitration Provision nor the Class Waiver as to the absent, putative plaintiffs. Dancers at both locations signed ELAs as a prerequisite to their performing at the clubs. Defendants attached affidavits from Jon Allen, the general manager of Temptations Beaumont, [Dkt. 118-1], and Michael Mayes, the general manager of Temptations Fort Worth confirming this. [Dkt. 118-4]. Both are the custodians of records for their respective locations, and both testified that every dancer was required to execute an ELA before she was given access to perform at the club. [Dkt. 118-1; Dkt. 118-4]. All ELAs contained the Arbitration Clause, including the embedded Class Waiver, just like those of the named Plaintiffs. *Id.*

Analyzing waiver as to the absent collective now might seem premature, and, in the days of the rigid *Lusardi* two-step, it might have been. But this is the age of *Swales*. As explained, when asked "to delineate—within *Lusardi*—the district court's notice-sending discretion," the Fifth Circuit rejected *Lusardi* and, instead "embrace[d] interpretative first principles": (1) Section 216(b) of the FLSA; and (2) the Supreme Court's admonition in *Hoffmann-La Roche Inc. v. Sperling* that, while a district court may facilitate notice to potential class members, it must not "stir up litigation." *Swales*, 985 F.3d at 434 (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989); *In re JPMorgan*, 916 F.3d at 500–02. The existence of arbitration agreements is a dispositive, threshold matter. *Id.* This is because "courts may not send notice to an employee

15

with a valid arbitration agreement unless the record shows that nothing in the agreement would prohibit that employee from participating in the collective action." *Id.* at 501. Applying the binding principles of the FLSA itself, *Swales, JPMorgan*, and *Hoffmann-La Roche*, the Court has determined in its "broad, litigation-management discretion" that it must resolve this issue now. *Swales*, 985 F.3d at 443.

### a. Waiver and the Putative Plaintiffs.

Defendants have not waived the Arbitration Provision or the embedded Class Waiver as to the absent class members. To start, in their live answer, all four Defendants—including JAI—affirmatively pleaded: "The claims of Plaintiffs and putative claims of others are barred, in whole or in part, because they executed arbitration agreements." [Dkt. 80 at ¶ 99]. But this Circuit's interpretation of Supreme Court precedent does not even consider this act necessary for Defendants to preserve their rights.[13]

In *Cruson v. Jackson Nat'l Life Ins. Co.*, the Fifth Circuit expressed that "[t]o rule that [defendant] was required, on pain of waiver, to raise a personal jurisdiction objection against those putative class members would validate 'the novel and surely erroneous argument that a nonnamed class member is a party to the class-action litigation *before the class is certified*.'" 954 F.3d 240, 250 (5th Cir. 2020) (quoting *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011)) (emphasis original). This is because "[w]hat brings putative class members before the court is certification." *Id.* at 250. Certification "is the critical act which ratifies the unnamed class members, and, critically, renders

---

[13] *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 250 (5th Cir. 2020) and *Forby v. One Techs., LP*, No. 3:16-CV-856-L, 2020 WL 4201604, at *9 (N.D. Tex. July 22, 2020) are both class action cases. The Court understands that class actions and collective actions are not the same; however, it finds the former instructive. This is because, "[u]nlike Rule 23 class certification, [t]he sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court" and "[w]hatever significance conditional certification may have in § 216(b) proceedings, it is not tantamount to class certification under Rule 23." *Swales*, 985 F.3d at 440 (internal quotations and quotation marks omitted). If a putative class under Rule 23 is not properly before the Court (and the other party) before certification, a putative collective is even more abstract.

them subject to the court's power." *Id.* (quoting *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015) (internal quotations omitted)).[14] Defendants could not have waived the ELA's provisions as to putative class members because this class has not been certified—those individuals are not before the Court.

And, in *Forby v. One Techs., LP*, the court determined that, although the *named* Plaintiffs were not bound by the arbitration provision, the putative class members were. No. 3:16-CV-856-L, 2020 WL 4201604, at *9 (N.D. Tex. July 22, 2020). Therefore, the court reasoned "that the absent class members would either be bound by the terms of the arbitration agreement, or have defenses and challenges . . . that are unique to those of [the plaintiff] since she is not subject to the terms of the provision." *Id.* This "defeat[ed] her ability to certify a class." *Id.* Thus, even if the ELA were waived as to the named Plaintiffs, it has not been waived as to the rest of the putative class. *See, e.g.*, *id.* at *8 ("As Defendants note, they have not waived their rights to compel arbitration against the absent class members, nor can the court make such determination prior to class certification, as the class members are not yet parties to the litigation.") (citing *Cruson*, 954 F.3d at 251).

### b.  The Putative Plaintiffs are Bound by their ELAs.

As discussed, "courts may not send notice to an employee with a valid arbitration agreement unless the record shows that nothing in the agreement would prohibit that employee from participating in the collective action." *In re JPMorgan*, 916 F.3d at 501. Therefore,

---

[14] This Circuit approvingly cited the Eleventh Circuit's decision in *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015), which dealt with whether defendants waived their right to compel arbitration as to absent class members. *Cruson*, 954 F.3d at 250. In that case, the district court had held that a defendant that waived arbitration as to the named plaintiffs prior to class certification also waived arbitration as to the unnamed class members. The Eleventh Circuit reversed the trial court, explaining that "[a]bsent class certification, there is no justiciable controversy between [defendant] and the unnamed putative class members." *Id.* (citing *In re Checking*, 780 F.3d at 1037).

Defendants must assure the Court by a preponderance of the evidence that the putative plaintiffs are held fast by their ELAs. *Id.* at 503. They have carried their burden.

First, the integrity of the ELAs as to any putative class members who have signed the ELAs remains intact. As discussed, the ELAs' operative provisions are not void due to unconscionability, nor have Defendants had the opportunity to waive them as to the absent class members.

Second, Defendants have presented the Court with uncontroverted affidavits from its managers and custodians of records. [Dkts. 118-1, 118-4]. They have also produced ELAs for the named Plaintiffs. [Dkts. 53-3, 118-2, 118-3]. And, because the ELAs contain other provisions relating to house rules, dance fees, compensation, and indemnity, [*See generally* Dkts. 118-2, 118-3], strictly adhering to the practice of having all dancers sign ELAs is within the Defendants' best interests. The Court does not believe that ordering Defendants to produce every ELA would be fruitful under these specific facts. The list of potential collective action members would come from the Defendants, more specifically, from the Defendants' records. A putative plaintiff successfully onboarded so that she could pay her fees and clock-in would have a matching ELA. And, if she did not have a signed ELA, then she would not be subject to the same House Rules, compensation practices, and other conditions as the other putative plaintiffs. Under these specific facts in this unique case, the Court finds that Defendants have carried their burden.

In opposition, Plaintiffs cite to *In re Spiros Partners, Ltd.*, 816 Fed. App'x 985 (5th Cir. 2020). There, the Fifth Circuit affirmed that a district court could order the defendant "to produce the names of the putative class members along with their respective [contracts] containing the arbitration agreements" to determine "which putative members [were] subject to valid arbitration agreements, and thus which putative members will not receive notice." *Id.* at 987. However, the Fifth Circuit did not state that this was a *necessary* step in a court's applying the holding of

*JPMorgan*.[15] Plaintiffs also cite distinguishable, out-of-circuit opinions. In one of these cases, *Camp v. Bimbo Bakeries USA, Inc.*, the defendant had "not produced even a single executed arbitration agreement signed by a potential member of the collective" and, instead, "merely proffered an untethered" example agreement of a "few isolated pages." No. 18-CV-378-SM, 2019 WL 1472586, at *3 (D.N.H. Apr. 3, 2019). Here, Defendants have produced uncontroverted affidavits from their custodians of records and multiple ELAs. The other out-of-circuit case cited by Plaintiffs is similarly distinguishable. There, the North Carolina District Court "had yet to determine" if the contracts themselves would be upheld. *Mode v. S-L Distrib. Co., LLC*, No. 318CV00150RJCDSC, 2019 WL 1232855, at *4 (W.D.N.C. Mar. 15, 2019). In contrast, this Court has determined that the ELAs are enforceable.

The Court finds that, under these specific facts and in this specific case, Defendants have demonstrated by a preponderance of the evidence that the putative plaintiffs are held fast by their ELAs. And, because "a preponderance of the evidence shows that the [putative plaintiff] has entered into a valid arbitration agreement, it is error for" this court "to order notice to be sent to that employee as part of any sort of certification." *In re JPMorgan*, 916 F.3d at 503. Because the Class Waiver is enforceable as to the putative plaintiffs, the Court **DENIES** certification as to JAI and CBW. As previously stated, the ELAs used in Beaumont and Fort Worth contain a specific and enforceable Class Waiver as to JAI or CBW, respectively.

### B. Ashley Wilburn and the Fate of the Fort Worth Class.

Plaintiffs allege that Ashley Wilburn worked at Temptations for approximately three years. [Dkt. 108 at 35]. Defendants allege that they have no record of Wilburn ever performing at Temptations. [Dkt. 118-4 at 2]. However, in their own investigation, Defendants found a video of

---

[15] Furthermore, *In re Spiros Partners* was decided prior to *Swales*, meaning that conditional certification had *already* been granted. Now, the Court must consider such dispositive issues upfront, changing the calculus.

Wilburn stating that she had, when signing an agreement with another club, used her sister's name—Adrianna Wilburn—instead of her own. [Dkt. 53 at 2].[16] *Id.* Armed with this information, Defendants located an ELA for an "Adrianna Wilburn," listing the undersigned entertainer's stage name as "Honeybee." *Id.* This was the stage name that Ashley Wilburn used at Temptations. *Id.*

There is no ELA in the name of Ashley Wilburn. Plaintiffs do not contest this. In fact, they argue that her lack of an ELA should weigh in favor of granting certification because "there is no document signed by Plaintiff Wilburn which waives her right to proceed collectively." [Dkt. 121 at 2]. While this might free Wilburn from the clutches of the Class Waiver, it also means that she is not similarly situated as to the other named Plaintiff or as to the putative class members who *have* signed ELAs. *See, Forby*, 2020 WL 4201604, at *9 (denying certification when a named plaintiff was not bound by an arbitration provision but the absent class was because they would "have defenses and challenges . . . that are unique to those of Plaintiff"). The ELAs contain more than just the Arbitration Provision and Class Waiver—Ashley Wilburn does not have a signed a document subjecting her to, among other things, Defendants' payment practices or House Rules. And, even assuming that Ashley Wilburn is Adrianna Wilburn, this fact would need to be proven at an evidentiary hearing because all of Defendants' records are in Adrianna's name, including the logs containing the hours she worked that would be essential to damages calculations. This further undermines her ability to serve as a representative plaintiff.

Accordingly, the Court **DISMISSES** Ashley Wilburn's claims **WITHOUT PREJUDICE**. While there may be potential Fort Worth dancers who are similarly situated, there is no similarly situated class representative. Because this dismissal is without prejudice, a new

---

[16] Defendants explicitly incorporated this briefing.

class representative, if any, may be identified to represent the interests of the potential plaintiffs in Fort Worth.

### C. Is the Putative Collective Similarly Situated?

Plaintiffs contend that a collective action is the best vehicle to resolve the claims of the putative class, a class they contend could marshal 800 members. [Dkt. 108 at 7]. But, to proceed as a collective, Plaintiffs must first assure this Court that they are similarly situated under *Swales*. The Court finds that the Plaintiffs have met their burden as to the Beaumont dancers.

As discussed, this Circuit recently rejected the approach set forth in *Lusardi*, 118 F.R.D. 351 and issued new guidance for determining whether putative class members are "similarly situated" in *Swales*, 985 F.3d 430. Under *Swales*, "the district court has broad, litigation-management discretion [regarding class certification]." In fact, there are only two "binding commands on district courts" when it comes to class certification:

> (1) the FLSA's text, specifically § 216(b), which declares (but does not define) that only those 'similarly situated' may proceed as a collective; and (2) the Supreme Court's admonition that while a district court may 'facilitate[e] notice to potential plaintiffs' for case-management purposes, it cannot signal approval of the merits or otherwise stir up litigation.

*Id.* at 434. The aim is to "identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'" *Id.* at 439. Only then can a court determine whether to conditionally certify and issue opt-in notice. *Id.* at 434.

Certification itself depends on "whether merits questions can be answered collectively." *Id.* at 441–42. That is, "whether the court can determine if the named plaintiffs and proposed class members are employees or independent contractors on a class-wide basis." *Sterling v. Greater Hous. Transp. Co.*, No. H-20-910, 2021 WL 2954663, at *2 (citing *Miller v. Mackey Intern., Inc.*, 452 F.2d 424, 427 (5th Cir. 1971)). Generally, to determine if a class is similarly situated, courts

consider the members' factual and employment settings; (2) whether defenses are individualized or apply to the class as a whole; and (3) fairness and procedural considerations. *Swales*, 985 F.3d at 437. "If answering this question requires a highly individualized inquiry into each potential opt-in's circumstances, the collective action would quickly devolve into a cacophony of individual actions." *Id.* at 442.

This is a misclassification case, so the operative question here is whether the dancers are employees under the FLSA. To answer this inquiry, a court "focus[es] on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) (citing *Herman v. Express Sixty–Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998). Courts examine five non-exhaustive factors:

> (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship.

*Id.* No one factor is determinative. *Id.* (citing *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043–44 (5th Cir. 1987)). Plaintiffs argue that the common questions of fact present in the economic realities test can be answered "on a class basis because the facts and evidence are the same for the Plaintiffs and Class Members." [Dkt. 121 at 16]. Defendants disagree and point to the fact that the economic realities test is "highly dependent on the particular situation presented, and thus requires a fact intensive analysis." *Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287, 295 (S.D. Tex. 2012) (quotation omitted).

Plaintiffs rely heavily on *Sterling v. Greater Hous. Transport Co.*, No. 4:20-CV-0910, 2021 WL 2954663 (S.D. Tex. Jul. 14, 2021). There, the Chief Judge of the United States District

Court for Southern District of Texas, Lee Rosenthal, certified a class of drivers alleging misclassification under the FLSA when deposition testimony showed that the plaintiffs "all had the same job title, performed the same duties, were paid under the same compensation arrangements, wore the same uniforms, followed the same policies and procedures, were subject to the same hiring requirements, completed the same training, were supervised in the same way, were subject to the same level of control, and were required to follow identical" contracts. *Id.* at *2. Defendants were able to identify "some differences in job duties" between the drivers, including routes; method of hiring; uniforms; pay frequency; how hours were recorded; how the drivers acquired their vehicles; and who paid for insurance. *Id.* However, the defendant did not show that these differences would "require individualized proof or determination material to the" plaintiffs' employment status. *Id.* "Similar, immaterial differences are not disqualifications for finding employees who are similarly situated." *Id.* (citations omitted). Ultimately, Chief Judge Rosenthal granted certification because "the potential members' claims center[ed] on the same facts and evidence as to whether the drivers are employees or independent contractors." *Id.* at *3 (citing *T.S. v. The Burke Foundation*, No. Civ. A. 1:19-CV-809, 2021 WL 1807994 (W.D. Tex. Feb. 22, 2021)). "When 'the plaintiffs all have the same job description and the allegations revolve around the same aspect of that job,' certification should be granted." *Id.* at *2 (quoting *Swales*, 985 F.3d at 441–42)).

Likewise, certification was appropriate under the *Swales* standard for a class of oil-field workers with different job duties when the workers were subject to the same pay practice. *Young v. Energy Drilling Co.*, No. Civ. A. 4:20-CV-1716, 2021 WL 1550343 (S.D. Tex. Apr. 20, 2021)). And a class of janitorial workers merited certification even when they had different job titles. *Hernandez v. Pritchard Indus. (Sw.), LLC*, No. Civ. A 20-CV-0508, 2021 WL 1146005 (W.D.

Tex. Mar. 25, 2021). Moreover, in *Tyson Foods, Inc. v. Bouaphakeo*, the Supreme Court of the United States held that certification under the FLSA for overtime was appropriate even though employees spent different amounts of time donning and doffing their protective gear before and after shifts. 136 S.Ct. 1036 (2016). Thus, individualized issues are not fatal when representative evidence can be used to prove liability on behalf of the class. *Id.* at 1046.

The question here is the same as that in *Sterling*: "whether the court can determine if the named plaintiffs and proposed class members are employees or independent contractors on a class-wide basis." *Id.* at *2 (citing *Miller*, 452 F.2d at 427). Plaintiffs have proffered evidenced that all proposed class members: performed the same job duties; paid the same house fees; followed the same policies and procedures; clocked in and out using the same time-clock system; had to follow all "House Rules"; were required to maintain a professional appearance and act professionally at all times; were interviewed and hired and supervised by the managers at Temptations Beaumont; were subjected to the same level of control (whatever that level might be); worked during hours set by Temptations managers; were not paid wages; earned tips as compensation; lacked formal dance training; and were all classified as independent contractors. [*See* Dkts. 108-1; 108-3; 108-4; 108-5; 108-7; 108-10; 108-19; 108-20]. They also all signed near-identical ELAs setting out their working relationships. [Dkts. 118-1, 118-4; *see, e.g.*, Dkts. 118-2, 118-3]. Defendants controlled the clubs' promotions, lighting, hiring of waitstaff, insurance, inventory, and music. [*See* Dkt. 108-3]. Moreover, Plaintiffs have assured the Court that the differences between the dancers would not burden this Court with individualized sources of proof. This includes potential damages calculations.[17]

---

[17] Plaintiffs and putative class members did not work identical schedules. Even so, their damages, if any, may be calculated using a formula: Potential damages = (number of hours worked/shift) ($7.25) + (house fees paid). Defendants maintained records showing the number of hours worked by the dancers, [Dkts. 108-13, 108-14], and how

Defendants counter that there is a large range in the times that Dancers work and in how much Dancers make and charge clients. They also contend that there is also a large range in skill and diversity of tenure and exclusivity within the class: not all dancers performed at Temptations for the same amount of time, and some dancers performed at other clubs, too. These discrepancies, Defendants argue, would lead to the trier of fact's reliance on different sources of evidence throughout the putative class. In short, Defendants argue that, unlike the collective in *Sterling*, Plaintiffs have not "show[ed] that the potential members' claims center on the same facts and evidence as to whether the drivers are employees or independent contractors." *Sterling*, 2021 WL 2954662 at *3. However, the Court finds that the differences between the individual dancers will not "eviscerate all notions of judicial economy that would otherwise be served." *Peña v. Handy Wash Inc.*, No. 14 20352 CIV, 2015 WL 11713032, at *33 (S.D. Fla. May 22, 2015) (quotation omitted). The Court **GRANTS** certification as to Gabrielle Rogers and similarly situated Beaumont dancers as to RCI Holdings and RCI Dining. The Court **DENIES** certification as to JAI and CBW.

## IV.    DISCUSSION: NOTICE [DKT. 110]

As explained, this Court is bound by the Supreme Court's admonition that, while it has discretion to facilitate a collective action by sending notice, it must not stir up litigation. By granting Plaintiffs' Motion for Approval of Notice and Consent Form, it would do just that. This is because, while not addressed in the present Motion, there has been confusion as to who the defendants in the case should be, even excluding the curious case of JAI. There are two defendants in this case who Plaintiffs are not contractually barred from raising a collective action against: RCI

---

much the dancers paid in the form of house fees. [Dkts. 108-15, 108-16]. This is all that is required to calculate minimum wage payments—not the different times that the dancers worked nor the different amounts they made.

Holdings and RCI Dining. The balance of this Order grapples only with these two entities to avoid unnecessary headaches.

In their live Complaint, the Third Amended Complaint, Plaintiffs aver that Defendants "are effectively the same company and operate as a single enterprise," so they are a "single enterprise" under the FLSA. [Dkt. 75 at ¶ 16 (citing *Donovan v. Grim Hotel Co.*, 747 F.2d 966 (5th Cir.) *cert. denied*, 471 U.S. 1124 (1985))]. Among other facts, they allege that "Defendants share the same officers and directors, such as Eric Langan" who "oversees and controls the operations of each Defendant." *Id.* Defendants deny these allegations. [*See generally* Dkt. 80].

However, one of the reasons why this matter necessitated a *fourth* Complaint is that Defendants asserted that Plaintiffs had sued the wrong entity. [Dkt. 47]. They argued that RCI Dining has nothing to do with Temptations Beaumont—*JAI* managed Temptations Beaumont and RCI Dining managed a different club, Jaguars. *Id.* at 1–2.[18] Plaintiffs contested that they had "a good faith claim against RCI Dining" and did not wish to sue JAI. [Dkt. 73 at 4].

In their Answer to the live Complaint, Defendants again denied that RCI Dining operated the Beaumont location of Temptations. [Dkt. 80 at ¶ 28]. They also claimed that RCI Dining "is not liable in the capacity in which it has been sued." *Id.* at ¶ 100. All of this is made even more confusing by the fact that Defendant's witness for its 30(b)(6) deposition stated that "Temptations of Beaumont is owned by RCI Dining." [Dkt. 108-3 at 51:15–16]. Furthermore, while Defendants admit that RCI Holdings is a publicly traded company, they deny that it operates the relevant clubs. [Dkt. 80 at ¶ 25].

There is no motion to dismiss attached to the live Complaint. This issue was not briefed in the current Motions. Plaintiff levied its allegations against all defendants and Defendants

---

[18] This was what precipitated Plaintiffs' adding JAI to the action in their live Complaint.

responded in kind. Considering these disagreements, the Court finds that, to honor *Hoffman*'s clear admonition against stirring up litigation, it must further punish this already tortured case by ordering yet more briefing. To do otherwise would be to plant the seeds of litigation into the heads of the putative collective, and, should this action fall through, leave hundreds of opt-ins dressed up with nowhere to go. Plaintiffs must show cause as to why RCI Holdings and RCI Dining are proper defendants before this Court issues Notice. More explicitly: do Plaintiffs *have* a claim against these two defendants? The Court believes that **THIRTY DAYS** is an appropriate length of time. Defendants may also file briefs in support of their position. Parties may request extensions or, if they wish, an evidentiary hearing on the matter.

## V.      CONCLUSION

The Court has carefully reviewed this matter. For all the reasons foregoing, it is **ORDERED** that Plaintiffs' Motion for Certification Under the Fair Labor Standards Act [Dkt. 108] is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** only as to Gabrielle Rogers and the potential claims of Beaumont dancers against RCI Hospitality Holdings, Inc., and RCI Dining Services ("Beaumont"), Inc. Plaintiff Ashley Wilburn's claims as a potential representative are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' Motion for Approval of Notice and Consent Form, [Dkt. 110], is **DENIED**. Parties are **ORDERED** to submit briefing on whether RCI Hospitality Holdings, Inc., and RCI Dining Services ("Beaumont"), Inc. are proper Defendants in this action, subject to being the object of a collective action, within **30 DAYS**.

**SIGNED this 31st day of March, 2022.**

*Michael J. Truncale*
_____
Michael J. Truncale
United States District Judge

27